[No. 37102. En Banc. October 17, 1963.]

THE STATE OF WASHINGTON, *on the Relation of* SENATOR R. R. GREIVE *et al., Relators,* v. TOM MARTIN, *as Treasurer, Respondent,* ALBERT D. ROSELLINI, *as Governor, Intervenor.**

*The Attorney General, Philip R. Meade* and *Gerald F. Collier, Special Assistants,* for relators.

*Reported in 385 P. (2d) 846.

*The Attorney General* and *Philip H. Austin, Assistant,* for respondent.

*The Attorney General* and *Max R. Nicolai, Special Assistant,* for intervenor.

DONWORTH, J.—This is an original proceeding in mandamus to compel the State Treasurer to execute, issue and/or honor warrants drawn on certain specified funds for the expenses of the Washington Legislative Council for the duration of the 1963-65 biennium.

An alternative writ was issued directing the State Treasurer to comply with its provisions or to appear and show cause why a permanent writ should not issue.

Relators and respondent have signed and filed herein a statement of agreed facts reading as follows:

"I. The Relator R. R. Greive is a duly elected member of the Washington State Senate and at all times material herein was and is Vice Chairman and acting Chairman of the Washington State Legislative Council; the Relator Alfred O. Adams is a duly elected member of the Washington State House of Representatives and at all times material herein was and is Secretary of the Washington State Legislative Council.

"II. Tom Martin is and has been at all times material herein the duly elected Treasurer of the State of Washington.

"III. The Legislative Council has allotted and obligated all funds remaining in the 1961-1963 biennial appropriation for the reasonable and necessary expenses of the Legislative Council.

"IV. The Legislative Council on May 31, 1963, made demand upon the State Treasurer to honor vouchers and execute, issue and honor warrants drawn upon moneys appropriated to the Legislative Council by section 2, chapter 21, Laws of 1963, Ex. Sess., or in the alternative vouchers and warrants drawn upon moneys in the state treasury not otherwise specifically appropriated for the reasonable and necessary expenses of the Legislative Council from the present time through the end of the 1965 biennium.

"V. On the same date, the Treasurer refused to execute, issue or honor warrants so drawn.

"VI. The State Legislature, during its 1963 session, enacted Engrossed House Bill 1, Laws of 1963, Ex. Sess., on

April 6, 1963; the said bill was immediately thereafter transmitted to the Governor; on April 18, 1963, the said bill was approved by the Governor with the exception of certain items which were vetoed by the Governor, including the appropriation to the Legislative Council.[1]

"VII. Thereafter, the bill as partially vetoed was duly filed with the Secretary of State.

"VIII. It is necessary, in order for the Legislative Council to exercise its powers and perform its duties, that it make immediate expenditures from moneys appropriated by section 2, chapter 21, Laws of 1963, Ex. Sess. (Engrossed House Bill 1) or in the alternative from any moneys in the general fund not otherwise specifically appropriated."

The Governor was permitted to intervene in this proceeding and has filed a brief in support of the validity of the veto mentioned in paragraph six of the statement of agreed facts. Oral argument was also heard in support of his position.

Relators' principal argument is that the Governor has exceeded his constitutional authority in vetoing the 1963 appropriation for the Legislative Council, which is a part of Laws of 1963, Ex. Ses., chapter 21, § 2. The title of the act is as follows:

"AN ACT Adopting the budget; making appropriations and reappropriations for the operation of state agencies and for miscellaneous purposes; and declaring an emergency."

The particular portion of the act which was vetoed reads:

"General Fund Appropriation for all legislative interim committees duly constituted by the Legislature: PROVIDED, That expenditures for each committee shall not exceed the amounts designated herein as follows: Legislative Council, $177,741; Legislative Budget Committee, $160,000; Joint Committee on Education, $55,000; Joint Committee on Local Government, $45,000; Joint Committee on Governmental Cooperation, $45,000; Interim Fisheries Committee, $10,000; Public Pension Committee, $15,000; Committee on Labor Management Relations, $40,000; ..............$547,741."

Relators contend that, in vetoing the foregoing items, the Governor exceeded his constitutional authority and has

---

[1] The Governor's veto stating his objections to certain items in House Bill No. 1 is set forth in the appendix to this opinion in full.

invaded the domain of the legislature, thus impairing or destroying the separation of powers among the executive, legislative, and judicial branches of state government as provided for in our state constitution.

In their brief, relators' contention, succinctly stated, is as follows:

"Stripped of all extraneous considerations, we believe that the singular and essential issue of this litigation is the determination of whether or not the Governor of this state has exercised the executive veto beyond his inherent constitutional capacity to do so and thereby violated the inviolable—the doctrine of separation of powers—the absolute and enduring prohibition against the encroachment of the inalienable prerogatives of one branch of government by another.

"In this respect we think the rule is absolute: the Governor may not, by the exercise of his veto, impede or interfere with or in any way affect substantive or appropriative measures, whether statutory or parliamentary in form, adopted by the Legislature to facilitate it own internal function."[2]

■ The Legislative Council was created in 1947. See RCW 44.24. During the preceding 58 years since the state constitution was adopted, there was no similar body. The power of the legislature to create the council was upheld in *State ex rel. Hamblen v. Yelle*, 29 Wn. (2d) 68, 185 P. (2d) 723 (1947).

It is purely a creature of the legislature, and its creation was not required by the constitution. As this court stated in the above-cited case, at page 77:

"The statute (Laws of 1947, chapter 36) which created the legislative council, does no more than make available new machinery and new methods by which the members of the committee may keep themselves informed upon specific problems; and that statute does not impose upon the members of the council who are members of the legislature, any new office or trust. The additional duties which are imposed upon the legislative members of the council are no different

---

[2]Under a similar constitutional provision, the Supreme Court of Illinois, in *People ex rel. Millner v. Russel*, 311, Ill. 96, 142 N. E. 537 (1924), sustained the Governor's power to veto the appropriation for payment of a state officer's salary and also held that the act fixing the amount of his salary was not an appropriation.

in purpose and kind from those which they already perform."

Relators contend that the expenses of the council are in the same category as salaries of constitutional officers, which are payable regardless of the absence of an appropriation, but we think that the distinction between them is plain. No matter how essential the functions of the council may be to the constitutional performance of the legislature's duties under Art. 2, § 1, it is not a body created by the constitution. Hence, the authorities relied upon by relators are not in point.

In considering this contention, we must have in mind the language contained in Art. 3, § 12 of the constitution, which provides:

"Every act which shall have passed the legislature shall be, before it becomes a law, presented to the governor. If he approves, he shall sign it; but if not, he shall return it, with his objections, to that house in which it shall have originated, which house shall enter the objections at large upon the journal and proceed to reconsider. If, after such reconsideration, two-thirds of the members present shall agree to pass the bill it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present, it shall become a law; but in all such cases the vote of both houses shall be determined by the yeas and nays, and the names of the members voting for or against the bill shall be entered upon the journal of each house respectively. If any bill shall not be returned by the governor within five days, Sundays excepted, after it shall be presented to him, it shall become a law without his signature, unless the general adjournment shall prevent its return, in which case it shall become a law unless the governor, within ten days next after the adjournment, Sundays excepted, shall file such bill with his objections thereto, in the office of secretary of state, who shall lay the same before the legislature at its next session in like manner as if it had been returned by the governor. If any bill presented to the governor contain several sections or items, he may object to one or more sections or items while approving other portions of the bill. In such case he shall append to the bill, at the time of signing it, a statement of the section, or sections; item or items to which he objects

and the reasons therefor, and the section or sections, item or items so objected to, shall not take effect unless passed over the governor's objection, as hereinbefore provided."

Respondent invites our attention to the discussion of this section by the delegates in the Constitutional Convention in 1889. This discussion is contained in the Journal of the Washington State Constitutional Convention (published by Book Publishing Co., 1962) at pages 571 to 576. According to this report, several proposals regarding the veto power of the Governor were given thorough consideration by the delegates, and several changes (including omitting the veto power entirely) were suggested and rejected.

The language contained in Art. 3, § 12 (quoted above) was ultimately adopted by the delegates and was later approved by vote of the people on October 1, 1889, when the state constitution was adopted. The provisions of § 12 have never been amended during 74 years of statehood.

The legislative history of Laws of 1963, Ex. Ses., chapter 21, is as follows:

As House Bill No. 1, it first passed the house March 20, 1963, and passed the Senate with amendments March 30, 1963. Later, it was acted on by a Free Conference Committee whose report was adopted by both houses on April 6, 1963, and the bill, as amended by this report, was enacted in its final form on that date. The extraordinary session of the legislature adjourned *sine die* on April 6, 1963.

House Bill No. 1 was immediately transmitted to the Governor, who, on April 18, 1963, approved the bill with the exception of certain items which he vetoed. His act in vetoing the above-quoted appropriation for the Legislative Council is the basis for the present proceeding.

It is not claimed that the Governor, in vetoing this appropriation, did not act within the time, or in the manner, prescribed in Art. 3, § 12. Relators' position is that the Governor has exceeded his authority in vetoing the appropriation because (to quote their brief):

"The appropriation in question is critical to the intelligent discharge of the grave responsibilities conferred upon the Legislative Council. Unless it is free to acquit its duties

during the interim period unmolested by unlawful inter-
ference from the executive, it is no exaggeration to say that
a tragic and costly hiatus in the constant legislative im-
provement of government will result.

"The power of inquiry by the legislative branch is essen-
tial, inherent and unviolable and such a power must carry
with it the means of its satisfactory discharge. The power
of the Legislature to provide funds for the support of its
internal operations is sacrosanct, as an absolute and neces-
sary attribute of the right and power to govern its own
internal affairs."

Inherent in this argument is the proposition that, because
the appropriation was vetoed after the 1963 extraordinary
legislative session adjourned *sine die* and there will be no
opportunity for the legislature to override the veto until the
1965 session convenes (unless a special session should be
called meanwhile by the Governor), the Legislative Council
will be prevented by the Governor's veto from functioning
during the current biennium. Hence, the Governor has
thereby deprived the legislature of its power to govern its
own internal affairs.

We are not persuaded by this argument, because the
Governor's acts in the premises strictly complied with the
provisions of Art. 3, § 12. This section contains no exceptions
restricting his power to veto items appropriating funds for
any legislative purpose.

Furthermore, the Governor had no control over the time
of the adjournment of the 1963 extraordinary session. Only
the legislature had control of that matter. If it so desired,
it could have remained in session until the time expired
for the Governor to veto bills passed by it. In that event,
it could have immediately proceeded to reconsider this ap-
propriation in the light of the Governor's written objections
thereto. If two thirds of the members of each house then
present had voted to override the Governor's veto, that
would have been the end of the matter.

Neither did the Governor have any control over the time
when House Bill No. 1, or any other bill enacted by the
legislature, would be presented to him for his approval or

disapproval. Only the legislature had control over that matter.

As indicated above, when House Bill No. 1, after its passage by both houses, was presented to the Governor for his approval or disapproval, the extraordinary session had adjourned. In accordance with his constitutional authority, and within the time provided in § 12, he filed the bill in the office of the Secretary of State with his approval except as to the items to which he objected and as to which he stated his reasons therefor.

All this was done in strict compliance with § 12. It is immaterial that the legislature will have no opportunity to override the veto of the items involved in this case before January, 1965 (except for a possible extraordinary session meanwhile), and that the Legislative Council, in order to exercise its powers and perform its duties, must make immediate expenditures from the vetoed items described in House Bill No. 1.

Article 3, § 12, makes no exceptions as to the type of legislative enactment which is subject to veto. Section 12 specifically is all-inclusive in its scope. The first sentence reads:

"Every act which shall have passed the legislature shall be, before it becomes a law, presented to the governor. . . ."

Since the people, in adopting their constitution, made no exception to laws which are subject to the Governor's veto, this court will not read an exception into § 12 in view of the clear language used therein.

Article 8, § 4, of the constitution, as amended in 1922 (Amendment 11), provides:

"No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within one calendar month after the end of the next ensuing fiscal biennium, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be

applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

See, also, Art. 2, § 18, which includes the provision:

". . . And no laws shall be enacted except by bill."

Since we hold that the Governor's veto of the items contained in Laws of 1963, Ex. Ses., chapter 21, § 2, is valid, there is at present no appropriation of funds for the Legislative Council, and respondent has no authority to comply with the demand of relators to honor the vouchers and issue warrants upon the moneys referred to therein. See paragraph 4 of the statement of agreed facts.

With regard to relators' alternative demand that respondent honor vouchers and issue warrants upon "any moneys in the general fund not otherwise specifically appropriated," they rely on *State ex rel. Robinson v. Fluent*, 30 Wn. (2d) 194, 191 P. (2d) 241 (1948), which was a mandamus proceeding to compel the State Treasurer to pay a warrant drawn by the State Auditor to pay compensation for services rendered to the joint legislative fact-finding committee on un-American activities which was created by the concurrent resolution adopted by both houses. The decision concluded as follows, at page 226:

"By that resolution, the legislature provided, as it had the inherent power to provide, for payment of expenses of the members of the committee from moneys appropriated by Laws of 1947, chapter 1, for the expenses of the legislature."

Thus it was held that the two houses could, by joint resolution, provide for the payment of the expenses of committee members out of moneys theretofore appropriated for the expenses of the legislature.

In the case at bar, there is no such joint resolution providing for payment of the expenses of the Legislative Council.

Relators' second principal contention is that Laws of 1963, Ex. Ses., chapter 7, is a sufficient appropriation to authorize the expenditure of funds for the Legislative Council. They rely on the following portion of § 1 of that act:

"Each member of the senate or house of representatives serving on the legislative council, the legislative budget committee, or any other permanent or interim committee or council of the legislature shall be entitled to receive, in lieu of per diem or any other payment, for each day or major portion thereof in which he is actually engaged in business of the committee, notwithstanding any laws to the contrary, *twenty-five* dollars per day, plus mileage allowance at the rate of ten cents per mile when authorized by the committee or council of which he is a member and on the business of which he is engaged."

The title of chapter 7 reads as follows:

"An Act Relating to state government; and regulating the pay of senators and representatives on interim or permanent legislative committee or council duties; and amending section 1, chapter 10, Laws of 1959 first extraordinary session and RCW 44.04.120 and declaring an emergency."

It is clear from the title of chapter 7 itself and by comparing it with the title of chapter 21, that no funds were thereby appropriated for any purpose. Chapter 7 merely increased the amount which each member of the legislature was entitled to receive while serving on the Legislative Council from $20 per day to $25 per day. If it should be construed as an appropriation of funds, the act would violate the provisions of Art. 2, § 19, which reads:

"No bill shall embrace more than one subject, and that shall be expressed in the title."

The title of chapter 21 (which contained the vetoed items) properly stated that it was an act " .  .  .  making appropriations and reappropriations for the operation of state agencies  .  .  ."

Nor are we persuaded by the argument that we cannot consider the title or body of chapter 21 because, having been vetoed, it is the same as if it never existed. The Governor approved the majority of the items contained in the appropriation act, and those provisions, as well as the title of the act, are now in full force and effect. *State ex rel. Stiner v. Yelle*, 174 Wash. 402, 25 P. (2d) 91 (1933), cited by relators, is not applicable to the present situation.

We find no merit in relators' second contention.

136

■ Relators' next contention is that, even in the absence of any appropriation therefor, mandamus will lie to compel expenditure of funds not otherwise appropriated in order to pay the Legislative Council's reasonable and necessary expenses. Relators in this connection contend that respondent is obligated to issue interest-bearing warrants for the expenses of the Legislative Council payable whenever funds shall be made available for their payment.

Passing respondent's counter contention that no demand for such warrants has ever been made by relators, the fundamental change in the applicable law was the enactment of the Budget and Account Act (Laws of 1959, chapter 328, RCW 43.88), in which the legislature removed certain then existing duties from the office of State Auditor and transferred some of them to the State Treasurer. By that act, certain responsibilities as to pre-audits were vested in the Governor and the budget director. The validity of the act was sustained in *Yelle v. Bishop*, 55 Wn. (2d) 286, 347 P. (2d) 1081 (1959).

Without reviewing the provisions of the act in detail, the effect of it is to abolish the issuance of warrants in cases where there are no appropriated funds in the state treasury to pay them. Furthermore, the authority to issue warrants was taken away from the State Auditor and vested in the State Treasurer. See RCW 43.88.210(1).

RCW 43.88.160(2)(b) directs that the State Treasurer shall:

"Disburse public funds under his supervision or custody by warrant or check;"

The word "disburse" is defined in Webster's new International Dictionary (2d ed.) as "To pay out; to expend, usually from a public fund; . . ."

The State Treasurer, in discharging any of the duties imposed upon him by statute, must do so in accordance with the constitutional mandate. Article 8, § 4 of the constitution (as amended by Amendment 11), quoted above, is a specific directive binding on the treasurer. It orders that:

"No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; . . ."

As a result of the changes made by the Budget and Accounting Act, the decisions of this court cited by relators, in support of their contention last above-stated, are not applicable to the facts before us. See *State ex rel. Van Orsdel v. Yelle*, 15 Wn. (2d) 320, 130 P. (2d) 889 (1942), which was based on RCW 43.09.070 (Laws of 1890, p. 640), which has been repealed by implication by RCW 43.88.

We have considered the several arguments advanced by relators in support of their application for a writ of mandamus to compel the payment of the expenses of the Legislative Council during the current biennium, and have come to the conclusion that the writ must be denied.

In arriving at this decision, we have not considered the advantages or disadvantages of having the Legislative Council or other interim committees functioning between legislative sessions. This is purely a matter of legislative policy.

Nor have we been concerned with the cogency or lack thereof of the reasons stated in the Governor's veto message containing his objections to the items referred to therein.

Our sole concern is to see that the applicable provisions of our state constitution as originally adopted by the people (and as later amended) shall continue to be the fundamental law of this state.

"A written Constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and offices of government with respect to all matters covered by it and must control as it is written until it shall be changed by the authority that established it. No function of government can be discharged in disregard of, or in opposition to, the fundamental law. The state Constitution is the mandate of a sovereign people to its servants and representatives. No one of them has a right to ignore or disregard its mandates; and the legislature, the executive officers, and the judiciary cannot lawfully act beyond the limitations of

such Constitution." 11 Am. Jur. 651, Constitutional Law § 44.

" 'A cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, even though the circumstances may have so changed as to make a different rule seem desirable. In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. Furthermore, constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and therefore the courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders.' " *State ex rel. Banker v. Clausen,* 142 Wash. 450, 253 Pac. 805 (1927).

The peremptory writ is denied.

OTT, C. J., WEAVER, ROSELLINI, HUNTER, HAMILTON, and HALE, JJ., concur.

HILL and FINLEY, JJ., concur in the result.

APPENDIX

STATE OF WASHINGTON
Executive Department
OLYMPIA

April 18, 1963

Albert D. Rosellini
    Governor

To the Honorable
The House of Representatives of the State of Washington
    (Through the Secretary of State)

Ladies and Gentlemen:

I am filing herewith to be transmitted to the House of Representatives at the next session of the Legislature, without my approval as to certain items described below, *House Bill No. 1* (Extraordinary Session) entitled:

"AN ACT Adopting the budget; making appropriations and reappropriations for the operation of state agencies and for miscellaneous purposes; and declaring an emergency."

Two years ago the Legislature appropriated six million dollars more than was available to be spent by the state. This was a situation that I could not allow to exist. Accordingly, I put into effect stringent economies in the agencies under my control that corrected the situation.

This year, once again, the Legislature has pressed upon me a critical fiscal problem. I find myself faced with a legislative budget proposal that asks the state to spend three million dollars more than it will have available during the next two years. This, despite the fact that such a budget would be directly contrary to state law, which stipulates that spending may *not* exceed income.

As Governor, I am obligated to assure that this law is fully carried out. Therefore, I must choose one of two alternatives.

I can veto the entire budget proposal and call the Legislature back into a costly special session to correct this over-appropriation of funds. Or, I can follow a responsible course of action, as I did two years ago —that is, to veto certain items and require further stringent economies in departments under my control in order to achieve a balanced budget.

I choose the latter method.

My decision will result in a reduction of more than three million dollars in proposed spending, and bring the state budget into balance.

Through veto action I have assured savings of $565,000. The remaining imbalance through over-appropriated funds shall be absorbed by the state agencies over which I have direct control. I have instructed that State Budget Director plan for economies in the next two years to assure a reduction in spending by those agencies to a figure of two and a half million dollars below the totals appropriated to them by the Legislature. Only by instituting such sacrifices was I able to return the budget to a balanced condition.

Since the Legislature was instrumental in creating this situation, I decided that it must share the burden of the overall financial sacrifices that were necessary. Accordingly, the most substantial of the vetoed items relates to appropriations approved by the Legislature for its own interim committees.

In Section 2, under the heading of *"State Legislature"* there is a General Fund appropriation for all legislative interim committees in the amount of $547,741. This appropriation, together with other allowances for legislative salaries and expenses of $422,058 appropriated elsewhere in this bill; plus individual appropriations for the Commission on Game and Game Fish, the Joint Committee on Highways, the Public Pension Committee, amount to a total appropriation for legislative expenses of *over one million dollars during a period when the Legislature is not in session.* It seems curiously inconsistent that the Legislature does not exercise the same frugality necessary in every other agency of government when they appropriate for their own use.

In terms of interim committee membership, there are 131 committee positions available during the interim period for the 148 members of the House and Senate. I believe it is time to curb this practice which can only result in needless expense to the taxpayers. Although essential expenditures must be maintained, less desirable expenses must be eliminated. By combining the appropriation for numerous committees

in one sum, the Legislature purposely insulated unnecessary committees from executive veto.

While some of the committees included within this appropriation serve useful purposes, and many members of the Legislature serve commendably without selfish interest, other committees need serious re-evaluation. When the Legislative Council was first authorized in 1947, the express purpose was to stop the trend toward proliferation of interim committees which were used only as publicity and political tools. The Council was constituted with a balanced political representation to secure non-partisan interim study of important legislative problems. Yet the present Legislature has continued the coalition government by making the appointments strictly for political gain. There is even a serious question as to whether the Council is legally constituted because political considerations delayed the appointment of members. The original moral intent and legal directive has been violated.

It is patently clear that coalition government, which has resulted only in controversy, bitterness and rancor, should not be promoted during the interim period at an expense to the taxpayers of over a half million dollars.

During the past years, numerous committee staff studies having merit have been conducted, but the results have not been thoroughly analyzed by the Legislature. The elimination of the appropriation does not necessarily make the committees inoperative. This may be a good time for the members to catch up on the deluge of studies made in the past.

For the foregoing reasons, the appropriation of $547,741 to the legislative interim committees is vetoed. Interim committee appropriations from non-General Fund sources are not included in this appropriation and therefore substantial interim committee expenditures still remain.

In Section 1, under the general heading *"Department of Institutions —Soldiers' and Veterans' Home and Colony"* three provisos were attached to the appropriation as follows:

"*Provided*, that no part of this appropriation shall be used for the care and maintenance of members in the home having a yearly income of over $900 or with assets of over $900 unless all income and assets in excess of these amounts are paid into the general fund: *Provided*, that the director of the Department of Institutions may make rules and regulations for waiver of the foregoing proviso, for all, or such portion of income over $900, as in his discretion may be reasonably necessary for medical care not furnished by the Department of Institutions, support of dependents, and the payment of premiums on existing insurance, and such other situations as may be reasonably necessary to the welfare of such member: *Provided*, that nothing in this proviso shall be construed to modify or change the requirements for admission as provided by law and as prescribed in the rules and regulations of the Department of Institutions."

These provisos place a $900 per year income limitation on those persons otherwise eligible to receive the veterans' benefits made available by this appropriation. Income and assets in excess of this amount must be paid to the General Fund. While the intent of the Legislature in setting such a limitation is desirable, the $900 amount is both undesirable and unnecessary.

It is undesirable because the limitation is so low as to place a severe hardship on veterans and because of its doubtful legality, as indicated by an adverse Superior Court decision on a similar proviso in the 1961 Appropriations Act. It is unnecessary because the department can administratively set a more equitable limitation and because the total appropriation will effectively set the limits on membership.

For the foregoing reason, I am vetoing the above section.

In Section 1 under the heading of "INTERSTATE COMPACT COMMISSION" there is a General Fund appropriation of $17,000.

I am vetoing this item because I believe continuation of the staff work on the Columbia River Compact will in no way inure to the benefit of the people of the State of Washington. A proposed compact has been presented to the Legislature on several occasions and in each instance, the State of Washington has been asked to surrender much more than can be gained by entry into the compact. Washington State has by far the largest stake in the northwest river system and would have been relegated to a minority position if proposed Columbia River Compacts had been adopted.

Vetoing this appropriation does not dissolve the Commission. Should further work on the compact be indicated, present state and local agencies charged with the administration and control of our natural resources are available to provide the necessary staff review.

In Section 1, under the heading of "DEPARTMENT OF PUBLIC ASSISTANCE," within the proviso earmarking $100,000 for a study of federally-matched programs, there appears a limitation on the Governor's authority to select committee members in the following words:

". . . from the various areas of the state representing institutions of higher learning, governmental agencies, and statewide private social agencies."

While representation of these groups may be desirable, and will receive proper recognition in my appointments, any limitation on my authority to select the advisory committee for a study for which I will be held responsible is unwise.

Accordingly, I am vetoing this item.