[No. 37466. En Banc. May 21, 1964.]

THE STATE OF WASHINGTON *on the Relation of* REPRESENTATIVE WILLIAM S. DAY *et al., Petitioner,* v. TOM MARTIN, *as Treasurer, et al., Respondents,* ANN T. O'DONNELL, *et al., Intervenors.**

*The Attorney General* and *Robert A. Seeber* and *Larry C. Shannon, Special Assistants,* for petitioner.

*Reported in 392 P. (2d) 435.

*The Attorney General* and *Philip H. Austin, Assistant,* for respondents.

*Max R. Nicolai,* for intervenors.

DONWORTH, J.—This is an original proceeding in mandamus brought by certain members of the Washington Legislative Council who constitute the Executive Committee thereof, as Relators, to compel the State Treasurer and the State Budget Director to honor certain vouchers and to issue and honor certain warrants thereon. The purpose of the action is to compel the payment of certain expenses of the Legislative Council incurred during the present biennium from funds appropriated by the legislature by laws of 1963, Ex. Ses., chapter 21, § 1, from the General Fund for:

> "House of Representatives Expenses and salaries of members and employer's contribution to retirement plans................\$283,360."

In *State ex rel. Greive v. Martin,* 63 Wn. (2d) 126, 385 P. (2d) 846 (1963), this court upheld the legality of the Governor's veto of an appropriation of funds specifically intended for the payment of expenses of the Legislative Council during the current biennium. Our decision in that case described the legislative provisions relative to the creation of the Legislative Council and its functions. Reference is made to that decision for an understanding of the legal background of the problem presented in the present case.

This case is before us on an agreed statement of facts. After it was signed by respective counsel for relators and respondents, a further stipulation was signed wherein it was agreed that one member of the House of Representatives and two members of the Senate should be permitted to intervene herein "subject to the further stipulation that said Intervenors will not move to change the previously agreed upon Statement of Agreed Facts." Accordingly, the three members of the 1963 legislature were permitted to intervene herein, and their counsel filed a brief and pre-

sented oral argument in opposition to relators' application for a writ of mandamus.

Relators and respondents are in substantial agreement as to what are the principal issues presented by the statement of agreed facts filed herein, but relators have included in their brief a chronological tabulation of what they conceive to be the basic facts contained therein. This tabulation is as follows:

"*April 18, 1963*—The governor vetoed a specific appropriation to the legislative council.

"*May 31, 1963*—The legislative council commenced *State ex rel. Greive v. Martin,* 63 Wash. Dec. (2d) 125, 385 P. (2d) 846 (1963), challenging the governor's veto.

"*June 12, 1963*—Representative Day, Chairman of the legislative council, asked the attorney general if the legislative council could expend moneys appropriated to the legislature for house of representative expenses. . . .

"*June 27, 1963*—The attorney general advised the chairman of the legislative council that the legislative council could use the funds about which he inquired. . . .

"*July 1, 1963*—The legislative council commenced spending from the appropriation in question.

"*October 17, 1963*—This court rendered its decision in the *Greive* case, *supra.*

"*December 17, 1963*—The attorney general advised respondents that the Greive case raised a substantial doubt concerning the ability of the legislative council to spend the moneys in question, and advised respondents against honoring any legislative council vouchers thereafter. . . .

"*December 18, 1963*—Chairman Day was notified by respondents that certain vouchers for expenses of the legislative council were being returned without action because of the attorney general's advice of December 17, 1963, to them. . : .

"*January 6, 1964*—Chairman Day was notified that additional vouchers were being rejected. . . ."

Relators, in support of their demands for the approval of the vouchers and the issuance of the warrants which were submitted to respondents and refused by them, as described in the statement of agreed facts, refer to *State*

*ex rel. Robinson v. Fluent*, 30 Wn. (2d) 194, 191 P. (2d) 241 (1948), which involved Laws of 1947, chapter 1, § 1:

"There is hereby appropriated out of the general fund of the State of Washington the sum of four hundred seventy-five thousand dollars ($475,000), or so much thereof as may be necessary, to be used for the purpose of paying the expenses, except legislative printing, of the Thirtieth Legislature of the State of Washington."

The joint resolution (adopted by both houses of the legislature) creating a Legislative Fact-finding Committee on Un-American Activities, provided for the reimbursement of the committee members for their expenses while attending sessions,

". . . the same to be paid upon their individual vouchers, approved by the chairman of the committee, from any moneys appropriated for the expense of the thirtieth legislature, or from such other funds as may be made available therefor; . . ." House Concurrent Resolution No. 10, Laws of 1947, p. 1378.

In *State ex rel. Greive v. Martin, supra,* we quoted from the concluding portion of our decision in the *Fluent* case and commented thereon as follows:

". . . The decision concluded as follows, at page 226:

" 'By that resolution, the legislature provided, as it had the inherent power to provide, for payment of expenses of the members of the committee from moneys appropriated by Laws of 1947, chapter 1, for the expenses of the legislature.'

"Thus it was held that the two houses could, by joint resolution, provide for the payment of the expenses of committee members out of moneys theretofore appropriated for the expenses of the legislature.

"In the case at bar, there is no such joint resolution providing for payment of the expenses of the Legislative Council."

Relators refer to the foregoing quotation from *Fluent* and call our attention to RCW 44.24.060 (which relates to the payment of the expenses of the Legislative Council) emphasizing the following portion thereof:

". . . Vouchers may be drawn upon funds appropriated generally by the legislature for legislative expenses

or upon any special appropriation which may be provided by the legislature for the expenses of the council."

It is contended that this constitutes a clear and unambiguous expression of legislative authority for the Legislative Council to expend "funds appropriated generally by the legislature for legislative expenses." Furthermore, relators point out that in the statement of agreed facts it is stated that, from 1947 (when the Legislative Council was created) to and including 1953, the expenses of the council were paid exclusively from appropriations for the expenses of the legislature. During the 1953-55 biennium, the council's expenses were paid partly from this source and partly from a special appropriation for the council. Since then (*i.e.* during the last five biennia) such expenses have been paid exclusively from special appropriations for the council.[1]

Attached to the statement of agreed facts is an opinion of the Attorney General dated June 27, 1963, rendered at the request of relator Day as Speaker of the House, in which it is stated that the Legislative Council may, under RCW 44.24.060, expend a portion of the funds appropriated by the legislature for Senate and House expenses and salaries. This opinion cited an Attorney General's opinion previously rendered dealing with the same problem in 1953 in which the same result had been reached.

Relators point out that the legislature, in the last five sessions when it intended to withhold legislative expense moneys from use by the Legislative Council, has expressly excluded such use in the appropriation. Hence they say that there is every reason to believe that in this case the legislature intended to permit the Legislative Council to expend such funds.

We do not reach the same conclusion as relators do from a consideration of these statutes because, in the 1963 appropriation act, the legislature, in accordance with its custom established in recent years, had made a specific appropriation of $177,741 from the general fund for the

[1]During the current biennium, the council's expenses have not actually been paid from the special appropriation because of the Governor's veto thereof, which was upheld in the *Greive* case.

expenditures of the Legislative Council during the current biennium. The inference reasonably to be drawn from this fact appears to us to be that the legislature intended that this specific appropriation would be adequate for the purpose indicated. When the legislature made the $177,741 appropriation, it did not anticipate that the Governor would veto this item 12 days after the extraordinary session adjourned sine die. In other words, the legislature had reason to believe, when it passed the appropriation act, that the expenses of the Legislative Council were adequately provided for in the general fund appropriation for the several interim committees.

In the light of various items in the statement of agreed facts mentioned above, we turn to a consideration of the precise language of the appropriation contained in Laws of 1963, Ex. Ses., chapter 21, § 1, which relators contend is presently available to pay the expenses of the Legislative Council. It reads as follows:

"STATE LEGISLATURE
"General Fund Appropriation
    "Senate Expenses and salaries of members and employer's contribution to retirement plans.......... $ 139,298
    House of Representatives Expenses and salaries of members and employer's contribution to retirement plans ........................................ $ 283,360"

Relators do not contend that any part of the Senate appropriation is available to pay the expenses of the Legislative Council but they rely solely on the House appropriation as being available for this purpose.

It is first argued that the caption "STATE LEGISLATURE" above the words "General Fund Appropriation" in the above quotation must be construed as showing that the legislature intended that the sum of $283,360 should be used to pay the expenses of interim committees such as the Legislative Council.

We do not agree with relators' interpretation of the language used in the above-quoted items of the appropriation act nor with their other arguments to the effect that the Legislative Council, because it is the creature of both houses of the legislature, may, when authorized by both

houses, perform functions for the benefit of one house and have its expenses paid out of the appropriation for that house. As has been pointed out above, the fact that the legislature, in the same appropriation act, specifically appropriated $177,741 for the expenses of the Legislative Council, convinces us that it was not the intent to have its expenses paid from the item of $283,360 earmarked for "House of Representatives Expenses and salaries of members and employer's contribution to retirement plans."

In the Attorney General's opinion given to relator Day under date of June 27, 1963, upholding relators' present contention, it was pointed out that, if the appropriation for the House or Senate was resorted to for the purpose of paying Legislative Council expenses, two problems would most certainly arise:

(1) The members of the Senate and the House would probably have to forego some part of their salaries during the current biennium because, if this item was exhausted, there would be no appropriated money available to pay them in full. In this connection, the following portion of Laws of 1963, Ex. Ses., chapter 21, § 4, was quoted:

" ' . . . It shall be unlawful for any officer or employee to incur obligations in excess of approved allotments *or to incur a deficiency and any obligation so made shall be deemed invalid.* . . .' (Emphasis supplied.)"

(2) The legislature was obligated, as an employer under the State Employees' Retirement System, to make the required payments to the system "as long as funds. are available for such purpose."

It seems to us that it would be a very strained and unnatural interpretation of the appropriation act now before us to impute to the legislature an intent (after having expressly appropriated $177,741 for the Legislative Council's expenses) to jeopardize its own members' salaries during the current biennium and, also, to ignore its obligations as an employer to make the required payments to the State Employees' Retirement System.

Relators call our attention to the following paragraph in

the appropriation act which was not vetoed by the Governor:

"Notwithstanding any other provisions or limitations, the members of the foregoing legislative interim committees shall be reimbursed for their expenses incurred while attending sessions of such committees or while engaged on committee business authorized by such committees to the extent of twenty-five dollars per day plus ten cents per mile for authorized travel."

They assert that this language, being contained in the appropriation act itself, is an adequate expression of the legislative intent. They refer again to the *Fluent* case, *supra*, where we held that a joint resolution of both houses was sufficient to authorize the payment of the expenses of a legislative fact-finding committee "from any moneys appropriated for the expense of the thirtieth legislature, or from such other funds as may be made available therefore."

The above-quoted language of the 1963 extraordinary session appropriation act does not purport to appropriate any funds at all. It is similar to Laws of 1963, Ex. Ses., chapter 7 (which was discussed in the *Greive* case) in that it confirmed the increase in the per diem maintenance allowance for members of interim committees to $25 plus 10 cents per mile for authorized travel. Relators contend that, while the *amount* said to have been thus appropriated cannot be ascertained by reference to other laws (Const. Art. 8, § 4 (amendment 11)),[2] the court can consider other acts in pari materia to determine the legislative intent in making an appropriation. In their brief, relators state:

"Section 1, chapter 1, Laws of 1963, appropriated $504,300 for the expenses of the legislature and limited the senate to the use of $234,300 and the house of representatives to

---

[2]"No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within one calendar month after the end of the next ensuing fiscal biennium, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

$270,000. The amounts allocated to the two houses equal the total amount appropriated. Obviously, so far as joint operations of the legislature were concerned, one house or the other would have to pay for them from moneys made available to it; no intention was evidenced that any margin or excess of the appropriation should be expended *jointly* by the two houses."

We think that the fact that, as mentioned in the Attorney General's opinion of June 27, 1963, the members of the House would probably have to forego part of their salaries, and that the employer's contribution to the State Employees' Retirement System would have to be paid as long as funds were available for that purpose (if the appropriation of $283,360 was used to pay Legislative Council expenses), precludes our holding that the legislature, in appropriating this sum for House of Representatives' expenses, had the intent claimed by relators. To believe that the legislators intended to waive or defer the payment of their own salaries during the current biennium would be extremely naive.

Their various contentions as to the legislative intent are answered by the following computation of House expenses for the current biennium:

| | |
|---|---|
| Salaries of members (Statutory)................ | $237,600.00 |
| Salaries of interim employees (House Payroll Register) ................................. | 27,966.96 |
| Payments to Employees' Retirement System and Old Age & Survivors Insurance (Statutory)... | 16,101.00 |
| Total ............................... | $281,667.96 |

Subtracting this total from the House appropriation of $283,360, there remains only the sum of $1,692.04 to pay other expenses of the House of Representatives. Thus, it cannot be reasonably assumed that this small sum was intended to be appropriated to pay the expenses of the Legislative Council in addition to the item of $177,741 which was vetoed by the Governor.

Relators make the further contention that our decision should not invalidate the expenditures of any part of the House appropriation for Legislative Council expenses

which were made between June 27, 1963, when the Attorney General rendered his opinion at the request of relator Day, and December 17, 1963, when the Attorney General wrote respondents advising them that, in view of the *Greive* case, they should refrain from honoring any further vouchers drawn by the Legislative Council on the House appropriation or issuing any further warrants based thereon until the legal question involved could be litigated.

In the statement of agreed facts, it is stated that certain vouchers involved in this case were issued for expenses of the Legislative Council incurred prior to December 17, 1963, and that others were issued for expenses incurred subsequent to that date. None of the vouchers were honored by respondents because of the suggestion made by the Attorney General in his letter of December 17, 1963.

Relators take the position that, in any event, all vouchers issued prior to December 17, 1963, should be honored by respondents because the expenses were incurred by the Legislative Council in reliance upon the Attorney General's opinion of June 27, 1963. This situation is said by relators to call for the application of the principle of prospective overruling, which was discussed in our decision in *State ex rel. Washington State Finance Committee v. Martin*, 62 Wn. (2d) 645, 384 P. (2d) 833 (1963). Whatever the scope of this doctrine may be, it has no application in this case. State officials who take official action in accordance with the advice of the Attorney General are protected from liability in connection therewith. However, if a court later disagrees with the Attorney General's view of the applicable law, the fact that the state officer relied thereon does not ipso facto validate his unauthorized acts. We find no legal basis for making any distinction between vouchers presented to respondents for expenses incurred prior or subsequent to December 17, 1963.

Relators refer to RCW chapter 43.88 (the Budget and Accounting Act) and contend that the budget director has no authority to refuse to prepare warrants on vouchers duly approved by the Legislative Council. It is urged that his

duties under the act are purely ministerial and that he cannot refuse to perform them in this instance.

We think that we need not decide the limits of the authority of respondent Bishop as budget director under chapter 43.88 because, assuming, arguendo, that relators' interpretation is correct, respondent Martin, as State Treasurer, has authority to refuse to issue and honor warrants drawn on unappropriated funds. See Const. Art. 8, § 4 (amendment 11). Accordingly, no writ of mandate could be granted to relators in this case.

■ Relators' last contention is that this court cannot interfere with the internal affairs of the legislature by deciding whether the funds appropriated for the House of Representatives' expenses can be used to pay the expenses of the Legislative Council. Two cases are cited in support of this contention: *State ex rel. Daschbach v. Meyers*, 38 Wn. (2d) 330, 229 P. (2d) 506 (1951), and *State ex rel. Hodde v. Superior Court*, 40 Wn. (2d) 502, 244 P. (2d) 668 (1952). Each of these cases involved the procedural functions of the legislature. They have no application in the present case which involves the interpretation of an appropriation act. Neither the legislature nor any of its agencies may expend public funds without a proper appropriation as required by Const. Art. 8, § 4 (amendment 11). The question involved is properly to be decided by the courts. See *State ex rel. Greive v. Martin, supra.*

We have given careful consideration to all the various contentions advanced in relators' brief and are of the opinion that they do not warrant the court in granting the writ of mandamus prayed for.

Turning now to the issues sought to be raised in the brief of the intervenors, it is to be noted that both relators and respondents strenuously object to their being considered by this court. As pointed out above, the intervenors were permitted to enter this litigation some two weeks after it was instituted on the condition that they would not move to change "the previously agreed upon statement of agreed facts."

Relators, in their brief, after referring to the intervenors' agreement regarding the statement of agreed facts, state as follows:

"Now, the intervenors' brief has raised a hue and cry about alleged defects in the agreed statement of facts. First, the relators feel that those allegations should not be considered by this court since they constitute a violation of the stipulation upon which the intervention of the intervenors is predicated. Secondly, and more importantly, those allegations by the intervenors should not be considered because they constitute an attempt to clutter the record with collateral matters which are completely superfluous to the resolution of the issue presented by this writ of mandamus."

Respondents share relators' concern as to the scope of the intervenors' contentions. They assert that the intervenors have gone far beyond the statement of agreed facts and have clouded the legal issue through their insertion of irrelevant matter. After stating their position as to five particular points raised in the intervenors' brief, respondents say:

"In summary on this aspect of the case, the respondents would simply say this: The case is properly before this court in the exercise of its original jurisdiction for the purpose of resolving the basic question of availability to the Legislative Council of any portion of the 'House of Representatives Expenses' appropriation. Respondents are specifically opposed to any disposition of the case based upon intervenors' position which would either delay or preclude determination of this question in this proceeding."

In view of the objections raised by the original parties to this action and the conclusion that we have reached on the principal issue presented therein, we think that it is unnecessary to extend this opinion by discussing all the questions which the intervenors, in their brief, request us to decide. To do so would not change the result because the intervenors argue in support of, and pray for, the denial of the writ of mandamus, as do respondents.

Therefore, this decision shall not be regarded as being res judicata of any of the issues sought to be raised by the

intervenors other than the principal issue discussed herein. This issue is well stated by respondents as follows:

"May any portion of the $283,360 appropriation item made by § 1, chapter 21, Laws of 1963, Ex. Sess. (page 3, lines 9-11), *supra*, for 'House of Representatives Expenses and salaries of members and employer's contribution to retirement plans' be expended by the Legislative Council *for its operating expenses*?"

Since we have answered this question in the negative, relators' petition for a writ of mandamus is denied.

ALL CONCUR.

