[No. 46678. En Banc. May 22, 1980.]

THE STATE OF WASHINGTON, *Appellant,* v. JACK C. HOOD, ET AL, *Respondents.*

*Slade Gorton, Attorney General,* and *Thomas F. Carr, Assistant,* for appellant.

*Clinton, Fleck, Glein & Brown,* by *Robert V. Brown,* for respondent.

ROSELLINI, J.—The Attorney General brought this action on behalf of the State Auditor, pursuant to RCW 43.09.330.[1] The complaint sought damages allegedly resulting from certain procedures and activities of the defendants, as members of the Washington State Liquor Control Board (Board) in the years 1971 through May 1975, with respect to liquor samples furnished by manufacturers.[2]

After pretrial discovery was completed, and upon the pleadings and affidavits and other evidence then before the court, the defendants' motion for summary judgment was granted. The Superior Court explained its decision in a thoughtfully written opinion, which has been of much help to this court in reviewing the Superior Court's order. The following is substantially that court's summary of pertinent undisputed facts:

---

[1] "If any audit discloses malfeasance, misfeasance, or nonfeasance in office on the part of any public officer or employee, within thirty days from the receipt of his copy of the report, the attorney general shall institute and prosecute in the proper county, appropriate legal action to carry into effect the findings of such post–audit. . . ." RCW 43.09.330, in pertinent part.

[2] The suit had three basic causes of action. In the first it was alleged that defendants Hood, Hittle and Eldridge "received quantities of free liquor from vendors doing business with the State of Washington or applying to do business with the State of Washington in excess of that permitted by RCW 66.28.040." In the second it was asserted that defendants Hood, Hittle and Eldridge "received free [empty and full] special decanters, known as 'collector' items, from vendors doing business with the State of Washington or applying to do business with the State of Washington." The third allegation was that "liquor which was in the custody and possession of the [Board] was released or permitted to be released by defendants Hood, Eldridge and Hittle to liquor sales representatives for the purpose of giving such liquor to other persons."

Prior to May 14, 1971, and apparently for the entire history of the liquor board since 1934, liquor board regulations had permitted local distillery representatives to receive monthly allotments of liquor provided at the expense of their respective companies but upon which the state collected no profit or taxes. The regulations further permitted, but did not require, liquor manufacturers to provide free samples to the board itself for purposes of "negotiating sales." The so-called "board samples" were restricted to a maximum of one case per submission per board member and included providing board members with samples of liquor containers (bottles). The regulations, and the practices followed under them, did not include a specific accounting or record of the ultimate disposition of any samples.

The main events giving rise to this lawsuit seem to start with a State Auditor's preliminary draft of a post-audit report in December 1970 which was critical of liquor samples rules and practices. As a result of this report, and apparently some oral discussion with the State Auditor the board adopted new regulations on January 1, 1971, requiring payment of state taxes on and new methods of handling of dealer representative samples. On May 14, 1971, the State Auditor officially issued post-audit report No. 2729 which includes the comment that:

"On March 4, 1971, we received copies of Board minutes and other instructions issued by the Board relative to samples. It is apparent that these materials meet the basic thrust of the recommendations offered."

On September 28, 1971, the then three board members, including two of the present members, were indicted by a King County grand jury. Following this action the assistant attorneys general who worked with the liquor board were instructed by the Attorney General to cease advising the board on the subject of liquor samples. The indicted board members obtained private counsel to defend them against the indictments and were advised by this attorney to maintain the "status quo" as to their samples regulations and practices.

On September 15, 1972, the Auditor wrote another preliminary draft of a post-audit report, again critical on the subject of liquor samples, but when the official report No. 2973 was issued on May 4, 1973, all such criticism

was deleted. This action was taken on advice of the Auditor's "legal counsel" (the Attorney General). Following the preliminary draft of September 1972, the senior assistant attorney general representing the liquor board advised the board (in October 1972) that its practices relative to samples was "okay to continue."

On July 1, 1973, the board entirely discontinued the practice of allowing dealer representatives to receive sample allotments as in the past. On June 7, 1974, the Auditor issued another report which again deleted comments on the board's sample practices upon advice of "our legal counsel." In September 1974 the grand jury indictments were dismissed. [*See State v. Sponburgh,* 84 Wn.2d 203, 525 P.2d 238 (1974).]

Effective July 1, 1975, on an emergency basis and on September 21, 1975, on a final basis, the board adopted further regulations relating to samples, including a limit on samples to the board in accordance with the federal Bureau of Alcohol, Tobacco and Firearms standards for retail dealers.

Finally, on October 24, 1975, the Auditor issued Report No. 3279 which, on a post–audit (or after–the–fact) basis, provided a sharp detailed attack on the past regulations and practices of the liquor board relative to samples but which concedes that the board had corrected the problems.

> "In summary, the Board has taken action to satisfactorily resolve to our satisfaction all problem areas which we pointed out in the handling of 'samples.' The final action, as previously cited, took place on July 1, 1975."

The present action is the result of audit report No. 3279.

. . .

During the years prior to May 14, 1971, the commencement of the period of time involved in this case, the liquor board was represented by assistant attorneys general who have worked directly with the board. During the critical period of May 14, 1971, and June 30, 1974, this practice continued and the board was represented by its chief legal counsel, Mr. Arthur Mickey, and two attorney assistants. Mr. Mickey has been a lawyer for the board for more than 24 years and bears the title of "*Senior* Assistant Attorney General."

It is this court's opinion that there is no genuine issue of fact but that Mr. Mickey, as the authorized legal adviser of the board, has at all times material to this action advised the liquor board that its regulations and practices relative to samples were within the authority delegated to the board by the legislature and that the board has relied upon his advice.

■ In *State ex rel. Day v. Martin,* 64 Wn.2d 511, 520, 392 P.2d 435 (1964), we said:

> State officials who take official action in accordance with the advice of the Attorney General are protected from liability in connection therewith.

It is undisputed that the actions complained of here were official actions of the Board.

The Auditor does not quarrel with the rule. But he contends that the evidence of reliance upon advice of the Attorney General was insufficient to establish that fact, and that in any event such reliance was unjustified. The rule as stated in *State ex rel. Day v. Martin, supra,* does not require that reliance be proved; only that the action be taken in accord with the advice. However, since the advice here did not involve practices affirmatively suggested by the Attorney General but rather involved the approval of a course of action previously adopted by the Board, we will assume that reliance is a necessary element.

RCW 66.08.022 provides:

> The attorney general shall be the general counsel of the liquor control board and he shall institute and prosecute all actions and proceedings which may be necessary in the enforcement and carrying out of the provisions of this chapter and Title 66 RCW.
>
> He shall assign such assistants as may be necessary to the exclusive duty of assisting the liquor control board in the enforcement of Title 66 RCW.

In addition, RCW 43.10.040 requires the Attorney General to represent all state boards and to assign assistants to advise them in all matters involving legal or quasi–legal questions, except those declared by law to be the duty of the prosecuting attorney of any county. RCW 43.10.067

requires all boards and other state agencies to rely exclusively upon the advice of the Attorney General, with exceptions not relevant here.

In accordance with these provisions, the Attorney General has assigned assistants to advise the Board; and these assistants have consistently been housed with the Board, having day–to–day contact with its members. Mr. Arthur Mickey, the senior assistant attorney general assigned to the Board at the times pertinent to this action, had been with the Board for 24 years. He testified in his deposition that he was aware of its rules and practices with respect to samples, and that he had approved them. Although he could not recall specific occasions when he had advised the Board upon this particular matter, he found in his file a notation showing that he had given such advice and was certain in his mind that he had done so. The board members themselves, also vague as to the times and circumstances, were equally positive in their testimony that he had approved the practices as legal. The Attorney General himself stated publicly in 1976:

> In the case of the members of the Liquor Board, they had been acting and their predecessors had been acting for several decades under rulings from assistant attorneys general who represented them over the years that their dealing with liquor board samples was done in a proper fashion.

Mr. Mickey's testimony and that of the defendants upon this matter was undisputed. Furthermore, the Superior Court noted, where an attorney has served an agency as many years as Mr. Mickey had served the Board, he is bound to be familiar with its practices. There is no suggestion here that those practices were clandestine or concealed in any manner.

Further confirming that the assistant attorneys general assigned to the Board had approved its practices is a letter in the record from Mr. Mickey sharply disagreeing with the Auditor's report and with the assistant attorney general

who advised the Auditor. There is nothing in the record to indicate that Mr. Mickey's opinion has changed.

■ This undisputed evidence is sufficient to establish the fact that advice was given, and that the Board relied upon it, as it was required by law to do. But the Auditor suggests that the defendants could not reasonably rely on the informal advice of the assistant attorneys general assigned to their office, and should have requested a formal written opinion which, under RCW 43.10.030, the Attorney General is required to give when a request is made.

If the Auditor could show that it is customary for agencies or boards who are served by assistant attorneys general to request formal written opinions upon legal questions which arise in the conduct of their affairs, or if he could cite any authority that such an opinion is necessary to establish reliance, the contention might have some merit. But his brief is devoid of any such showing.

As the trial court further observed, the Attorney General himself had instructed his assistants to cease giving advice to the Board upon this particular matter, pending the grand jury investigation. Under such circumstances, a request for a formal opinion would have been futile. We conclude that reliance upon the Attorney General's advice was not disproved by a showing that no formal written opinion was requested.

It is also suggested that the defendants must have relied upon the advice of private counsel, rather than the advice of the Attorney General, since they were represented by such counsel in the grand jury proceedings. There is no evidence that their retained counsel advised them to do anything other than to "maintain the status quo" pending those proceedings. Certainly, they could not properly advise the defendants as to the future policies and regulations of the Board, since such counsel is, by statute, the responsibility of the Attorney General. It is reasonable to suppose that the defendants told their private counsel of the advice given them by the attorneys general assigned to their office, and that these attorneys likewise relied upon that advice in

suggesting that they maintain the status quo. Even assuming that the defendants relied in part upon advice of private counsel, the fact remains that they also relied upon the approval which these practices had consistently received from the Attorney General over the years in which they had been followed.

The Auditor also suggests that the advice of the assistant attorneys general assigned to the Board was so patently erroneous that no reasonable person in the position of the board members could rely upon it. The section restricting the right to give away liquor is RCW 66.28.040, which provides:

> No brewer, wholesaler, distiller, winery, importer, rectifier, or other manufacturer of liquor shall, within the state, by himself, his clerk, servant, or agent, give to any person any liquor; but nothing in this section shall prevent the furnishing of samples of liquor to the board for the purpose of negotiating the sale of liquor to the state liquor control board, and nothing in this section shall prevent a brewer from serving beer without charge, on the brewery premises, and nothing in this section shall prevent a domestic winery from serving wine without charge, on the winery premises.

This section was first enacted in Laws of 1933, 1st Ex. Sess., ch. 62, § 30, in substantially its present form, the last clause, concerning wine, having been added later. The evil which prompted its adoption has not been explored in the briefs and is not revealed in the statutory context. However, the Auditor appears to assume that its intent was to protect the State's interest in deriving income and revenue from the sale of intoxicants.[3] The act itself does not refer to such objectives, although the production of income and

---

[3]The Auditor's theory is that all liquor samples received by the Board, or by suppliers' representatives, which were not essential for sampling or testing, should have been placed on the shelves of retail stores and sold. If this were done, the State would receive an extra profit unless it reimbursed the supplier the amount which the latter would have charged the State had the liquor been sold to it instead of donated. It is interesting to note that the regulations adopted by the Board in 1975, providing for the disposition of excessive samples, does not adopt the Auditor's concept. Rather they require that such samples be returned to the

revenue is inherent in the system. The purpose of the legislation, which it declared was enacted pursuant to the police power of the State, was to regulate and control intoxicating liquors in the interest of the welfare, health, morals, peace and safety of the people. The statute made detailed provisions for the control of sales and use of intoxicants, and reveals a concern that they not be made available to minors or to persons who abused their use. These concerns are still present. *See* RCW 66.20.

It may have been that the restrictions placed on the suppliers were motivated by such concerns. It is perhaps more likely that such activities were associated with unfair business practices. Alcohol, Tobacco Products and Firearms, 27 C.F.R. Part 6 (1979),[4] which includes among its restrictions on suppliers' activities a regulation (section 6.29) relied upon by the Auditor as a standard for determining what constitutes a reasonable amount of liquor to be furnished as a sample, is directed at practices which tend to induce a retailer to purchase from the supplier, to the exclusion of other suppliers, or which tend to deter other suppliers from selling or offering the product for sale. (*See* section 6.20.) It may be that the legislature had something of this sort in mind when it restricted the giving away of alcoholic beverages by suppliers.

Whatever the evil which the legislature sought to forestall in this provision, the fact is that it placed no limit on the number of samples which the Board might receive and made no provision for the disposition of those samples. It did restrict the purpose for which such samples could be given to that of negotiating sales. It is not contended that

---

supplier, at the supplier's expense, or destroyed if the supplier is unwilling to pay the return shipment cost. *See* WAC 314-64-040.

[4]These regulations were promulgated by the federal Bureau of Alcohol, Tobacco and Firearms Department of the Treasury, pursuant to 27 U.S.C. § 205 (1976). Section 6.29 restricts gifts to retailers; it does not purport to apply to gifts to wholesalers or state agencies.

the samples submitted to the Board were offered for any other purpose.

Under RCW 66.08.050(9), the Board is given a broad discretion in carrying out the provisions of the statute. The evidence before the court showed that quantities of samples accepted and the disposition made of them had a practical basis and resulted in no demonstrated harm to the State or the public. Beverages received by the Board in excess of those needed for testing or tasting were given away.[5] The Board had several choices with respect to their disposition. It could have returned them to the suppliers, or destroyed them, or given them to others. According to the advice of its attorneys, it was not free to sell them. The choice was made to give them away.

While it might appear to many, including this court, that the wiser course would have been to return the excess samples to the sender or destroy them, as the Board now does according to its regulations, it is evident that for many years the option previously chosen by the Board aroused no criticism.

The practices complained of in this suit were instituted shortly after the legislation was first adopted, and were pursued without objection of the Auditor, the Attorney General, or the legislature for some 36 years. The section permitting suppliers to furnish samples to the Board was amended in 1935, 1969, and again in 1975, after the grand jury investigation which called Board practices into question. Still the legislature did not see fit to alter the provision permitting submission of samples to the Board, without limitation on the amount. The legislature did enact a new section, RCW 66.28.045,[6] which reaffirmed the necessity and desirability of sample submissions. It required the

---

[5]Newspaper clippings in the record report that some were sent to the Governor's mansion for use in entertaining.

[6]"The legislature finds the furnishing of samples of liquor to the state liquor control board is an integral and essential part of the operation of the state liquor business. The legislature further finds that it is necessary to establish adequate

Board to adopt appropriate regulations to establish standards for accountability for the receipt, use and disposition of samples, but left the formulation of those standards to the administrative judgment.

In light of the fact that the language of the statute placed no limitation on the amount of samples to be received or the disposition to be made of them, and considering the long continued legislative and auditorial acquiescence in the practices of the Board with respect to the receipt and disposition of such samples, the interpretation placed upon the section by the assistant attorneys general assigned to advise the Board, whether it was correct or not, was not so improbable that reliance upon it was unjustified.

The undisputed facts which were before the Superior Court show that the practices of the defendants with respect to the receipt and disposition of samples furnished by suppliers were approved by assistant attorneys general assigned to advise them; and consequently they cannot be the basis of civil liability. *State ex rel. Day v. Martin,* 64 Wn.2d 511, 392 P.2d 435 (1964).

What we have said upon this subject applies to the practices with respect to submission of samples of "collectors' items" as well as samples of liquor. The Board, under RCW 66.08.050, is given the power to determine the nature, form and capacity of all packages to be used for containing liquor kept for sale under the act. Accordingly it was appropriate for it to receive samples of containers for the purpose of negotiating purchases of such items, and to dispose of them in ways not inimical to the purposes of the statute.

The statutory justification for the practice of permitting certain suppliers' agents to withdraw their supplies of liquor from the State's warehouse, without paying the

---

standards for the accountability of the receipt, use and disposition of liquor samples. The board shall adopt appropriate regulations pursuant to chapter 34.04 RCW for the purpose of carrying out the provisions of this section." RCW 66.28.045.

State's markup on such beverages,[7] is not as apparent as the authority for the Board's acceptance of samples. However, as we have noted, the Board was given broad authority in conducting its business; the practice was not an uncommon one, and there was no showing that the agents' supplies were used for unlawful purposes. The practice was governed by written regulation, and was permitted for the purpose of retaining some control over the amount of liquor given by a supplier to its agents. The Attorney General could reasonably construe RCW 66.28.040 as not prohibiting a supplier from giving liquor to its own employees, assuming that the evil at which the legislation was directed was either unfair business practices or the giving of liquor to minors or interdicted persons. It is safe to assume that suppliers' agents fall in neither of these latter categories, and gifts to them do not affect free competition. Like the practices with respect to Board samples, this procedure met with no objection on the part of the Auditor or the legislature before 1970. In light of these facts, we think the defendants were justified in relying upon the advice of their attorney.

The judgment is affirmed.

UTTER, C.J., WRIGHT, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., and SOULE, J. Pro Tem., concur.

---

[7]Having received the Auditor's criticism of this practice, the Board discontinued it in 1973.